# FRIER LEVITT

ATTORNEYS AT LAW

Jonathan E. Levitt, Esq. (JL 3881)
Todd Mizeski, Esq. (TM 3854)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile:   (973) 618-0650
jlevitt@frierlevitt.com
tmizeski@frierlevitt.com

Attorneys for Plaintiffs, Smart Pharmacy, Inc. and Highland Pharmacy, L.L.C., individually, and On behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SMART PHARMACY, INC., and HIGHLAND PHARMACY, L.L.C., individually, and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MEDCO HEALTH SOLUTIONS, INC., <br><br> Defendant. | Civil Action No. 11-CV-6485 (DMC-JAD) <br><br> Hon. Dennis M. Cavanaugh, U.S.D.J. <br> Hon. Joseph A. Dickson, U.S.M.J. <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT, JURY DEMAND, DESIGNATION OF TRIAL COUNSEL AND LOCAL CIVIL RULE 11.2 CERTIFICATION** |

Plaintiffs, Smart Pharmacy, Inc. ("Smart") and Highland Pharmacy, L.L.C. ("Highland") (unless otherwise specified, Smart and Highland are collectively referred to hereafter as "Plaintiffs"), individually and on behalf of others similarly situated, by and through its attorneys, **FRIER & LEVITT, LLC**, and by way of First Amended Complaint against Defendant, Medco Health Solutions, Inc. ("Medco" or "Defendant"), allege as follows upon personal knowledge as to themselves, and as to all other matters upon information and belief:

<u>**NATURE OF THE CASE**</u>

1.     This is a class action lawsuit brought by Plaintiffs on behalf of themselves and all others similarly situated who contracted with Defendant for the reimbursement of covered

pharmacy services provided to Defendant's Eligible Persons, and who have suffered from Defendant's abusive audit and reimbursement practices.

2.  Covered Services are defined as "[t]he providing of prescription drugs, services, over the counter ('OTC') products and other medical products and services covered by Plan Sponsors. Medco is required to reimburse the pharmacy for Covered Services rendered to Eligible Persons.

3.  Eligible Persons are individuals that participate in one of Medco's Plan Sponsors' plans.  Through their membership in the Plan Sponsors' plans, Eligible Persons receive a pharmacy benefit administered by Medco.

4.  Medco has engaged in a widespread practice of retracting monies owed to pharmacies based on a variety of alleged discrepancies with regard to claims submitted to Medco from the pharmacy.  These purported discrepancies include, but are not limited to, "Overpriced Compound" and "Refill-Too-Soon" (discussed in detail below).

5.  When Medco unilaterally determines that there is a discrepancy involving a claim, typically though not always occurring after an audit, Medco unilaterally and improperly retracts monies from the pharmacy for the alleged discrepancies by withholding future reimbursements due and payable to the pharmacy.

6.  Medco's practice of improperly retracting monies from pharmacies is widespread and has involved hundreds, if not thousands, of pharmacies across the United States.

7.  The Relevant Time Period at issue are claims that were submitted by pharmacies for which Medco retracted monies, or advised the pharmacy of its intent to retract monies, in the past six (6) years.

**JURISDICTION & VENUE**

8.  Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332(d)(2) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy

exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

9.      Venue is proper in this District pursuant to 28 U. S C. § 1391 as Defendant's principal place of business is in this District and the events giving rise to the claims occurred in this District.

## THE PARTIES

### The Plaintiffs

10.     Smart is a corporation organized and existing under the laws of the State of Florida with a business location at 1650 San Pablo Road South, Suite 17, Jacksonville, Florida 32224.

11.     Smart is a community and compounding pharmacy servicing the Jacksonville, Florida area.

12.     Highland is a limited liability company organized and existing under the laws of the State of Michigan with a business location at 4000 Highland Road, Suite 113, Waterford, Michigan 48328.

13.     Highland is a community and compounding pharmacy servicing the Waterford, Michigan area.

### The Defendant

14.     Defendant, Medco Health Solutions, Inc., (hereinafter "Medco" or "Defendant") is a corporation organized and existing under the laws of the State of Delaware.

15.     Medco maintains its principal place of business at 100 Parson Pond Drive, in Franklin Lakes, New Jersey 07417.

16.     Medco is one of the largest Pharmacy Benefit Managers ("PBMs") in America.

17.     A Pharmacy Benefit Manager (PBM) is a third party administrator of prescription drug programs. A PBM is primarily responsible for processing and paying prescription drug claims.

## **FACTS COMMON TO ALL COUNTS**

18.     Medco enters into contracts with various corporations/employers, insurers and health plans ("Plan Sponsors") who provide a prescription drug benefit to their employees, members, or other beneficiaries.  Such prescription drug benefits typically pay part or all of the costs of drugs covered by the plans.

19.     The relationship between Smart and Medco and Highland and Medco (as well as all members of the Classes and Medco) is governed by the same Medco Pharmacy Agreement ("Pharmacy Agreement"), Medco Pharmacy Services Manual ("PSM") and various Medco Network Schedules ("Schedules").  Unless otherwise specified, the Pharmacy Agreement, PSM and Schedules are hereinafter collectively referred to as the "Agreement".

20.     The terms of the Agreement are non-negotiable and identical for nearly every pharmacy in the country.

21.     Defendant created a proprietary on-line system of "adjudicating" prescriptions with pharmacies in its network called the TelePAID© system.  Adjudication is the process whereby the pharmacy and Medco agree on the terms of a prescription drug claim submitted by the pharmacy to Medco, including the price of the prescription.

22.     Only after the parties have a meeting of the minds as to price for a given prescription through TelePAID©, do the Plaintiffs (and members of the Classes) fill and dispense the prescription.

23.     Based on the course of dealings between the parties, the adjudicated price set forth through TelePAID© is the contract price.

24.     Based on the general usage in trade, the price set forth through TelePAID© is the contract price.

4

25.     The TelePAID© adjudication is supported by consideration in that Plaintiffs (and the class members) pay approximately $0.10 to $0.99 per on-line submission.

26.     According to the Agreement between Medco and Plaintiffs (and the class members); Medco will pay Pharmacy for covered services provided by Pharmacy to Eligible Persons in accordance with the payment rate information communicated via the TelePAID© System, less the applicable co-payment/co-insurance, deductible or other payment to be paid directly by the Eligible Person.

27.     Medco remits payment to the Pharmacy on a bi-weekly or semi-monthly basis, for prescription drug claims submitted to it by the Pharmacy through TelePAID©.

28.     Medco and Plaintiffs (as well as the putative members of the Classes) establish "mini-contracts" each time an offered price is communicated through the TelePAID© System by Medco and Plaintiffs accept the offer by filling the prescription.  Once Medco processes the claims submission, this becomes an enforceable contract, requiring Medco to reimburse Plaintiffs (and the members of the Classes) at the rate communicated through the TelePAID© System.

29.     In addition, by filling the prescription based on the price and information communicated through the TelePAID© System, Plaintiffs (and the members of the Classes) rely on Medco's reasonable promise to reimburse them for those prescriptions at the rates set forth therein.

30.     Most pharmacies are reluctant and fearful of challenging Medco's audits because Medco cardholders represent a substantial percentage of the pharmacies' gross revenues and the pharmacies are afraid that if they challenge Medco, they will be subject to retaliation by Medco including, but not limited to, Medco deciding to terminate the Agreement.

31.     In accordance with the Agreement, Medco retains the right to audit Plaintiffs' claims submissions through TelePAID©.

32.     If, in connection with an audit, Medco unilaterally determines that it has "overpaid" Plaintiffs, it issues a letter enclosing a "Discrepancy Evaluation Report" ("DER") advising Plaintiffs that they were allegedly overpaid.  Medco further advises Plaintiffs that Medco will retract the overpaid amounts from future payments that Medco owes them.

33.     The DERs provided by Medco do not explain why Medco is retracting the money beyond a classification description such as "Overpriced Compound" or "Refill-Too-Soon."  The DERs do not explain how Medco arrived at its unilateral decision that the claims were overpaid, or how Medco calculated the amount of overpayment.

34.     By way of example and not limitation, in connection with "Overpriced Compounds," the DER does not tell the pharmacists the ingredients used in re-pricing at the time of audit, the corresponding NDC numbers and AWP values, the applicable co-pay, or the dispensing fees being applied.

35.     By way of further example and not limitation, in connection with "Refill-Too-Soon," the DER does not tell the pharmacists on what basis the prescription has been refilled too soon.

36.     Medco frequently begins to retract money from a pharmacy prior to the expiration of thirty-five (35) days of the pharmacy's receipt of Medco's DER and accompanying letter advising of the alleged overpayment in violation of Florida's Prompt Pay laws.

## FACTS SPECIFIC TO PLAINTIFF, SMART PHARMACY, INC.

37.     The contractual relationship between Smart and Medco (as well as all members of the Classes and Medco) is governed by the Pharmacy Agreement, PSM and Schedules (collectively, the "Agreement").

38.     The terms of the Agreement are non-negotiable and identical for nearly every pharmacy in the country.

39.     Smart is a pharmacy that provided prescription drug services to Medco cardholders.

40.     From on or about December 16, 2008 through May 28, 2010 (hereafter, "Smart Audit Period"), Smart submitted prescription drug claims to Medco through the TelePAID© system.

41.     Within seconds, TelePAID© accepted Plaintiff's prescription drug claims.  Smart then dispensed the medication to the patient and collected the applicable co-payment, if any.

42.     Medco paid Smart the price that the parties agreed to at the point-of-sale through TelePAID©.

43.     On or about June 29, 2010, Medco conducted an on-site audit of Smart.

44.     Medco did not "randomly" audit Smart.  Medco targeted Smart for an audit because Smart performs significant compounding.  When a pharmacy reaches a certain dollar amount or volume of compound prescriptions, Medco performs an audit.

45.     Under cover of letter dated June 20, 2011, Medco sent Smart a DER identifying what Medco unilaterally and improperly determined were "discrepancies" regarding various claims submitted to it by Smart.  Specifically, Medco unilaterally and improperly determined that during the Smart Audit Period, various compound prescription drug claims submitted during the Smart Audit Period were "overpriced".

46.     In addition, Medco identified certain prescription drug claims as having been refilled too soon when, in fact, they were properly refilled early because the patient requested a vacation supply because the patient was going to be out of the pharmacy's geographic area on the date that the refill became due.  In this situation, Smart properly entered the correct vacation supply override code (which, upon information and belief is "03") when performing the override to submit these claims through Medco's TelePAID© System, in accordance with the Agreement.  Medco accepted the claims after the override code was entered.  Smart then filled and dispensed the prescription to the patient.

47.     Nevertheless, the June 20, 2011 letter stated, in part, that Medco intended to recover the total sum of $502,511.84 as a result of these alleged discrepancies.

48.     As a result of its unilateral and improper determination, Medco **recovered most, if not all, of the $502,511.84 that Medco originally paid Smart for these prescriptions. In other words, Medco is recovering 100% of the amount that it previously paid Smart for these prescriptions. Thus, Smart will have been paid nothing for the expensive prescriptions that it undoubtedly filled and dispensed to Medco cardholders** (with the exception of the nominal co-pay paid to Plaintiff by the patient at the point-of-sale)**.**

49.     Medco does **not** contest that the prescriptions were filled by Smart and dispensed to the patients.

50.     Medco did not reject any of the subject prescription drug claims at the point-of-sale through the TelePAID© system. Rather, Medco bases its recovery of $502,511.84 from Smart on its contention that the prescription claims were "overpriced" or refilled too soon.

51.     At all times, Smart filled and dispensed the correct amounts of the medications to its patients, in accordance with the prescribing physicians' instructions.

52.     Smart is a Florida pharmacy providing covered services to Medco's eligible persons.

53.     In its letter to Smart advising of its alleged overpayment of claims to Smart, Medco states that it will be recouping monies for the alleged discrepancies from future reimbursements to the pharmacy.

54.     Florida's Prompt Pay Act (including, but not limited to, F.S.A. § 641.3155, et seq. and F.S.A. §627.6131, et seq.) prohibits Medco from reducing payment to Smart for other/future claims submitted by Smart to Medco unless Smart consents in writing or fails to contest Medco's overpayment claim within 35 days of receipt of Medco's notice. Smart did not consent, in writing or otherwise, to Medco's recovery of monies from other claims that Smart submitted to Medco.

Moreover, Smart contested Medco's alleged notice of overpayment claims within 35 days of Medco's notice.  Nevertheless, Medco has retracted monies from Smart in violation of Florida's Prompt Pay Act.

55.     Medco has deprived Smart of its right and ability to contest Medco's alleged claims for overpayment by improperly retracting monies from Smart despite the fact that Smart did not consent to Medco's reduction of payment to Smart for other/future claims submitted by Smart to Medco.

56.     Medco has deprived Smart of its right and ability to contest Medco's alleged claims for overpayment by improperly retracting monies from Smart prior to the expiration of thirty-five (35) days from Smart's receipt of Medco's alleged overpayment claims, in violation of Florida Prompt Pay laws.

57.     Medco's PSM expressly prohibits a pharmacy, including Smart, from contesting several different types of alleged overpayment discrepancies including, but not limited to, overpriced compound discrepancies, in violation of Florida Prompt Pay laws.

58.     Medco never informed Smart of its right to object to Medco's retraction of monies from other/future claims that Smart submitted to Medco, in violation of Florida's Prompt Pay laws. Upon information and belief, Medco failed to adhere to the requirements of Florida's Prompt Pay Act in order to recover as much money as possible from Smart, with the knowledge and/or intent that Smart would never assert its rights under the Florida statute.

## FACTS SPECIFIC TO PLAINTIFF, HIGHLAND PHARMACY, LLC

59.     The contractual relationship between Smart and Medco (as well as all members of the Classes and Medco) is governed by the Pharmacy Agreement, PSM and Schedules (collectively, the "Agreement").

60.     The terms of the Agreement are non-negotiable and identical for nearly every pharmacy in the country.

61.     Highland is a pharmacy that provided prescription drug services to Medco cardholders.

62.     From on or about August 27, 2009 through August 20, 2010 (hereafter, "Highland Audit Period"), Highland submitted compound prescription drug claims to Medco through the TelePAID© system.

63.     Within seconds, TelePAID© accepted Highland's prescription drug claims. Highland then dispensed the medication to the patient and collected the applicable co-payment, if any.

64.     Medco paid Highland the price that the parties agreed to at the point-of-sale through TelePAID©.

65.     On or about September 13, 2010, Medco conducted an on-site audit of Highland.

66.     Medco did not "randomly" audit Highland.  Medco targeted Highland for an audit because Highland performs significant compounding.  When a pharmacy reaches a certain dollar amount or volume of compound prescriptions, Medco performs an audit.

67.     Under cover of letter dated August 17, 2011, Medco sent Highland a DER identifying what Medco unilaterally and improperly determined were "discrepancies" regarding various claims submitted to it by Highland.  Specifically, Medco unilaterally and improperly determined that during the Highland Audit Period, various compound prescription drug claims submitted during the Highland Audit Period were "overpriced".

68.     In addition, Medco identified certain prescription drug claims as having been refilled too soon when, in fact, they were properly refilled early because the patient requested a vacation supply because the patient was going to be out of the pharmacy's geographic area on the date that

the refill became due.  In this situation, Highland properly entered the correct vacation supply override code (which, upon information and belief is "03") when performing the override to submit these claims through Medco's TelePAID© System, in accordance with the Agreement.  Medco accepted the claims after the override code was entered.  Highland then filled and dispensed the prescription to the patient.

69.     Nevertheless, the August 17, 2011 letter stated, in part, that Medco shall recover the total sum of $268,872.21 as a result of these alleged discrepancies.

70.     As a result of its unilateral and improper determination, Medco has not yet recovered, but has advised Highland that it shall recover, all of the $268,872.21 that Medco originally paid Highland for these prescriptions.  In other words, Medco has advised Highland of its intent to recover 100% of the amount that Medco previously paid Highland for these prescriptions.  Thus, Highland will have been paid nothing for the expensive prescriptions that it undoubtedly filled and dispensed to Medco cardholders (with the exception of the nominal co-pay paid to Plaintiff by the patient at the point-of-sale).

71.     Medco does **not** contest that the prescriptions were properly filled by Highland and dispensed to the patients.  Rather, Medco bases its unilateral audit conclusions on its contention that the prescription claims were "overpriced" and/or refilled too soon.

72.     Medco did not reject any of the subject prescription drug claims at the point-of-sale through the TelePAID© system.

73.     At all times, Highland filled and dispensed the correct amounts of the medications to its patients, in accordance with the prescribing physicians' instructions.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this suit as a class action on behalf of itself and on behalf of all others similarly situated (the "Classes") pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).  Subject

to additional information obtained through further investigation and/or discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment or amended complaint.

75.     Plaintiffs represent the following Classes:

a.  ***The Vacation Supply Class:***  All pharmacies who have submitted at least one claim to Medco for reimbursement for the refill of a prescription based on a patient's request for an early refill because the patient was not going to be available on the day the refill otherwise became due and where: (1) the pharmacy entered the vacation supply override code number ("03") when performing the override to submit the claim(s) through Medco's TelePAID© system, (2) Medco accepted the claim(s) after the override code was entered, (3) the claim(s) was subsequently audited by Medco, and (4) monies were either recouped by Medco or are subject to recoupment by Medco for an alleged "Refill Too Soon" discrepancy within the past six (6) years (hereafter, the "Vacation Supply Class").

b.  ***The Overpriced Compound Class:***  All pharmacies who have submitted at least one claim to Medco for reimbursement and for which the NDC number of either the highest-priced Federal Legend Drug or any individual ingredient in the compound was "51927-xxxx-00" (with the four middle digits varying by ingredient), and which claim(s) was subsequently audited by Medco and for which monies were either recouped by Medco, or are subject to recoupment by Medco, for an alleged "Overpriced Compound" discrepancy since June 30, 2009. (hereafter, the "Overpriced Compound Class").

c.  ***The Florida Class:***  All pharmacies licensed in the State of Florida that have submitted at least one claim to Medco for reimbursement, which claim(s) was subsequently audited by Medco, and for which monies were subsequently recouped by Medco within the past six (6) years, where: (1) the claim(s) was submitted for an eligible person who's pharmacy benefits were being administered by Medco at the time of submission, (2) the claim was submitted for an eligible person, but not under a self-funded plan, and (3) (a) Medco began recouping monies from the pharmacy prior to the expiration of thirty-five (35) days following the pharmacy's receipt of the DER and/or accompanying letter from Medco advising of the alleged overpayment, or (b) Medco retracted monies after the expiration of thirty-five (35) days following the pharmacy's receipt of the DER and/or accompanying letter from Medco, but where the pharmacy contested the alleged overpayment (hereafter, the "Florida Class").

76.     The Vacation Supply Class, the Overpriced Compound Class, and the Florida Class shall be referred to collectively as the "Classes."

77.     Plaintiff Smart is a member of each of the three (3) Classes and is representative of the putative class members in each of the three (3) Classes.

78.     Plaintiff Highland is a member of the Vacation Supply Class and Overpriced Compound Class and is representative of the Vacation Supply Class and Overpriced Compound Class.

79.     This action has been brought and may be properly maintained as a class action for the following reasons:

a.      <u>Numerosity</u>:  Members of the Classes are so numerous that their individual joinder is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Classes contain hundreds and perhaps thousands of members in diverse locations and therefore are so numerous and geographically dispersed that joinder is impracticable. Although the exact number of class members is presently unknown to Plaintiffs, Plaintiffs anticipate that Medco maintains detailed computerized records sufficient to determine the number of class members and to ascertain their identities.

b.      (1) <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members within each of the Classes.  These questions predominate over the questions affecting individual members of each Class. These common legal and factual questions include, but are not limited to, the following:

i.      As to all the Classes, whether on-line adjudication via the TelePAID System creates a binding contract that obligates Medco to pay the Plaintiffs and the class members the reimbursement amount transmitted to the Plaintiffs and the class members;

ii.     If the answer to (i) is yes, whether Medco's retraction or reversal of reimbursements following an audit while altering the method or formula for compound pricing reimbursement is a breach of the contract so

created;

iii.   If the answers to (i) and (ii) are yes, when did such audit practices commence and how much money has Medco reversed or retracted by means of such practices;

iv.   As to all Classes, do Medco's audit practices violate the implied covenant of good faith and fair dealing found in every contract between Medco and the members of the Classes;

v.   Are Plaintiffs and the class members entitled to declaratory and/or injunctive relief and, if so, what that relief should be;

vi.   As to the Vacation Supply Class, whether the class members' submission of vacation override codes through the TelePAID© System constituted substantial performance with the agreement with Medco;

vii.   As to the Vacation Supply Class, and assuming the answer to (vi) is yes, what damages are the Vacation Supply Class members entitled;

viii.   As to the Overpriced Compound Class, does Medco's practice of using of different methodology to re-price compound prescription drug claims at the time of audit, as compared to at the point-of-sale through the TelePAID© System, constitute a breach of contract or breach of implied covenant of good faith and fair dealing.

ix.   As to the Florida Class, whether Medco violated Florida's Prompt Pay Act (including, but not limited to, F.S.A. § 627.6131, et seq. and § 641.3155, et seq.) by retracting monies reimbursed to the Florida Class members without their consent; and

x.      Are Plaintiffs and the members of the Classes entitled to compensatory

damages, punitive damages, attorney's fees and costs, restitution and/or

disgorgement, or other monetary remedies and, if so, in what amounts.

(2) This is by no means an exhaustive list of questions of law and/or fact that are

common to the members of the Classes and which predominate over any questions

affecting only individual members of the Classes.  The disposition of the claims of

Plaintiffs and all other members of the Classes in a single action will provide

substantial benefits to the parties and the Court.

c.      <u>Typicality</u>:  Plaintiffs' claims are typical of, if not identical to, the claims of the

members of the Classes since Plaintiffs and all other members of the Classes: (1) operated

under the same Medco Provider Agreement and Medco Pharmacy Services Manual, (2)

submitted claims via the TelePAID© System, and (3) were affected by the same unlawful

and wrongful practices in which Medco engaged, as alleged herein.  Furthermore, Plaintiffs

and all members of the Classes sustained monetary and economic injuries arising out of

Defendant's wrongful conduct.  Plaintiffs are advancing the same claims and legal theories

on behalf of themselves and all absent class members.

d.      <u>Adequacy</u>:  Plaintiffs are adequate representatives of the Classes because

Plaintiffs' interests do not conflict with the interests of the members of the Classes that it

seeks to represent; Plaintiffs have retained counsel competent and experienced in pharmacy

class action litigation who intend to prosecute this action vigorously and on behalf of all

members of the Classes.  Neither Plaintiffs nor their attorneys have any conflict in

undertaking this representation.  The interests of the Classes will be fairly and adequately

protected by Plaintiffs and their counsel.

e.   <u>Superiority</u>:  A class action is superior to alternative means of adjudication of the claims of Plaintiffs and the members of the Classes for the following reasons, among others: Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort and expense that numerous individual actions would engender.  This action will result in the orderly and expeditious administration of class claims.  Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent and varying determinations. Prosecution of actions such as this in numerous forums would serve no purpose, would entail enormous expense, and would promote a lack of uniformity in the interpretation of contracts and law.

80.   Because of the wrongs suffered by individual class members or the amount of damages, restitution and/or disgorgement to which some class members may be entitled may be relatively small, the expense and burden of individual litigation would make it difficult for the members of the Classes to effectively seek redress individually for Medco's wrongful conduct.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and supervision by a single court.

81.   In the absence of a class action, Defendant would be unjustly enriched because it would retain the benefits and fruits of its wrongful conduct against members of the Classes.

82.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

### *As to Vacation Supply Class Members*

83.   Medco requires prescriptions to be filled by pharmacies, including Plaintiffs, in accordance with the prescribing physician's instructions.

84. The PSM mandates that the pharmacy must submit an "override" of "03" in the NCPDP "Rx Clarification Field" to indicate that a patient has requested an earlier refill because he or she will be out of the area at the time when the prescription becomes due to be refilled. Typically, if a prescription is submitted to be filled before the patient is due for a refill, the TelePAID© System will display a "refill-too-soon" rejection message. In such cases, the pharmacist is instructed by Medco to enter the appropriate override code through the TelePAID© System.

85. When the Vacation Supply Class members had a patient request an early refill because they would be out of the pharmacy's geographic area on the date that the refill became due, Plaintiffs and the Vacation Supply Class Members entered the correct vacation supply override code (which, upon information and belief is "03") when performing the override to submit these claims through Medco's TelePAID© System. Medco accepted the claims after the override code was entered.

86. Over the course of the last six (6) years, Medco has recouped monies and/or subjected monies to recoupment from Plaintiffs and the Vacation Supply Class members based on Medco's unilateral and improper on-site, telephone and desk audit conclusions.

87. Following these audits, Medco sent Plaintiffs and the Vacation Supply Class Members a DER identifying what Medco unilaterally and improperly determined to be "discrepancies" regarding various claims submitted to it by Plaintiffs and the Vacation Supply Class Members. Specifically, Medco unilaterally and improperly determined that various prescription drug claims submitted Plaintiffs and the Vacation Supply Class Members constituted a "Refill Too Soon" discrepancy. The Medco letters state, in part, that Medco intends to recover various sums of money as a result of these alleged discrepancies.

88. As a result of its unilateral and improper determination, Medco has **recovered 100% of the amount that Medco previously paid Smart and the Vacation Supply Class Members**

**for the prescriptions.  Thus, if Medco is successful in recovering these monies, Smart and the Vacation Supply Class Members will have been paid nothing for the expensive prescriptions that they undoubtedly filled and dispensed to Medco cardholders** (with the exception of the nominal co-payment paid to Plaintiffs and the Vacation Supply Class Members by the patient at the point-of-sale).

89.     In other circumstances, Medco has audited, but not yet recouped from Highland and the Vacation Supply Class Members monies for claims Medco has deemed to constitute "Refill Too Soon" discrepancies.  These "open audits" (as they are referred to by Medco) represent instances where Medco has determined a claim to constitute a "Refill Too Soon" discrepancy and intends to recoup monies from Highland and the Vacation Supply Class Members, but Medco has not yet recouped the monies.  Medco has advised that it shall recoup monies from Highland and those Vacation Supply Class Members who have an "open audit".

90.     In each case, there is no dispute that: (1) there was a valid prescription, including refills, for the medication, (2) the patient requested the early refill because he or she would be out of the area at the time the prescription became due, (3) Plaintiffs and the Vacation Supply Class members refilled and dispensed these prescriptions, and (4) the patients received the prescriptions.  Nevertheless, Medco has recovered and/or shall seek to recover the monies it previously paid Plaintiffs and the Vacation Supply Class Members for these prescriptions.

91.     At all times, Plaintiffs and the Vacation Supply Class Members filled and dispensed the correct amounts of the medications to their patients, in accordance with the prescribing physicians' instructions.

### As to Overpriced Compound Class Members

92.     Medco reimburses pharmacies that it contracts with for Covered Services dispensed to Eligible Persons, including compounded prescriptions.

93.     Compounding differs from traditional "lick-them-and-stick-them" prescriptions in which the pharmacist simply counts the number of pills of a commercially available drug, affixes a label to the bottle, and dispenses it to the customer.

94.     Compounding is the process by which a pharmacist "combines, mixes or alters ingredients to create a medication tailored to the needs of the individual patient.  Compounding is typically used to prepare medications that are not commercially available." Thompson v. Western States Medical Center, 535 U.S. 357 (2002).

95.     Compounding is a "specialty" and is a pharmacy "art", which is not regularly performed by the vast majority of chain pharmacies.  Patients often need dosages or delivery systems, e.g. medicated lollipops for children, which are not "commercially available".

96.     Prior to compounding a prescription for the patient/insured, the Overpriced Compound Class Members submit a proposed price for the compound prescription through Medco's TelePAID© system.

97.     Medco "adjudicates" the claim within seconds using TelePAID©'s complex compound prescription "algorithm".  TelePAID© electronically transmits (back to the pharmacy) the price that Medco will pay the pharmacy for the compound prescription.

98.     Medco also competes with the pharmacies in its network insofar as Medco owns one of the largest mail order pharmacies in the country.

99.     Medco's mail order pharmacy provides compound prescriptions.

100.     At the time of audit, Medco (without previously advising pharmacists) uses a completely different methodology for re-pricing the compound, as compared to the methodology used at the point-of-sale ("POS") through the TelePAID©.

101.     At the POS, the TelePAID© System applies a "lesser of" methodology for pricing the compound.  Specifically, three (3) competing pricing methods at the POS comprise the "lesser

of" analysis: (a) "Calculated Ingredient Cost" ("CIC"), i.e, the term used to denote a calculation of the AWP of the highest priced federal legend drug in the compound, minus the applicable contracted discount plus the applicable contract dispensing fee ; (b) usual and customary ("U&C"); and (c) submitted ingredient costs ("SIC").

102.    In contrast, at the time of the Audit, Medco applies a completely different re-pricing methodology allegedly based upon the compound "recipe".  Medco purportedly calculates the value of each ingredient multiplied by the quantity of each ingredient used by the pharmacist to make the compound.  Each ingredient has an NDC number and a corresponding AWP value and quantity utilized to compound the product.  The NDC numbers, quantities and corresponding AWP values are supposed to derive from the pharmacist's compound "recipe".  However, Medco often uses a recipe that differs substantially from the actual recipe used by the pharmacist.

103.    The Overpriced Compound Class Members are pharmacies that provided (among other things) compound prescription drug services to Medco cardholders.

104.    The Overpriced Compound Class Members submitted compound prescription drug claims to Medco through the TelePAID© system.

105.    Within seconds, TelePAID© accepted the Overpriced Compound Class Members' prescription drug claims.  The Overpriced Compound Class Members then dispensed the compound medication to the patient and collected the applicable co-payment, if any.

106.    Medco paid the Overpriced Compound Class Members the price that the parties agreed to at the point-of-sale through TelePAID©.

107.    Medco has conducted hundreds, if not thousands, of on-site, telephone and desk audits of the Overpriced Compound Class members.

108.    Medco did not "randomly" audit the Overpriced Compound Class Members.  Rather, Medco targeted the Overpriced Compound Class Members for audits because they perform

significant compounding.   When a pharmacist reaches a certain dollar amount or volume of compound prescriptions, Medco is aware of this and performs an audit.

109.     Over the course of the last six (6) years, Medco has recouped monies and/or subjected monies to recoupment from the Overpriced Compound Class members based on Medco's unilateral and improper on-site, telephone and desk audit conclusions.

110.     Following these audits, Medco sent the Overpriced Compound Class Members a DER identifying what Medco unilaterally and improperly determined to be "discrepancies" regarding various claims submitted to it by the Overpriced Compound Class Members.   Specifically, Medco unilaterally and improperly determined that various prescription drug claims submitted the Overpriced Compound Class Members constituted an "Overpriced Compound" discrepancy.   The Medco letters state, in part, that Medco intends to recover various sums of money as a result of these alleged discrepancies.

111.     During these audits, Medco applies a methodology to price compounds that differs from TelePAID©'s methodology of pricing compounds at the point-of-sale.

112.     There is no indication in the Agreement, nor does Medco ever reveal, that it will re-price compound prescriptions using an entirely different method than that set forth in the PSM.

113.     Moreover, nothing in the DER provided by Medco explains the methodology Medco uses when re-pricing compounds at the time of an audit.   The Overpriced Compound Class Members are forced to guess at the formula and methodology used by Medco to price compounds, making it nearly impossible to avoid an audit retraction when submitting claims for compound prescriptions.

114.     As a result of its unilateral and improper determination, Medco has **recovered and/or seeks to recover 100% of the amount that Medco previously paid Smart and the Overpriced Compound Class Members for the compound prescriptions.   Thus, if Medco is**

**successful in recovering these monies, Smart and the Overpriced Compound Class Members will have been paid nothing for the expensive compound prescriptions that they undoubtedly filled and dispensed to Medco cardholders** (with the exception of the nominal co-pay paid to Plaintiffs and the Overpriced Compound Class Members by the patient at the point-of-sale).

115.    In other circumstances, Medco has audited, but not yet recouped from Highland and the Overpriced Compound Class Members monies for claims Medco has deemed to constitute "Overpriced Compound" discrepancies. These "open audits" (as they are referred to by Medco) represent instances where Medco has determined a claim to constitute an "Overpriced Compound" discrepancy and intends to recoup monies from Highland and the Overpriced Compound Class Members, but Medco has not yet recouped the monies. Medco has advised that it shall recoup monies from Highland and those Overpriced Compound Class Members who have an "open audit".

116.    Significantly, Medco does **not** contest that there were valid prescriptions for these compound prescriptions, that the compound prescriptions were filled by Plaintiffs and the Overpriced Compound Class Members, that the compound prescriptions were dispensed to the patients, and that the patients received the compound prescriptions. Rather, Medco bases its recovery of monies from Plaintiffs and the Overpriced Compound Class Members on its improper contention that the compound prescription claims were "overpriced".

117.    Medco did not reject any of the subject compound prescription drug claims at the point-of-sale through the TelePAID© system.

118.    At all times, Plaintiffs and the Overpriced Compound Class Members filled and dispensed the correct amounts of the medications to their patients, in accordance with the prescribing physicians' instructions.

### *As to Florida Class Members*

119.     Smart and the Florida Class Members are Florida pharmacies providing covered services to Medco's eligible persons.

120.     Smart and the Florida Class Members submit claims for reimbursement to Medco through Medco's TelePAID© System.

121.     Once the claims were submitted through the TelePAID© System and accepted by Medco, Medco remitted payment to Smart and the Florida Class Members as reimbursement for the claims submitted.

122.     Medco subsequently audited Smart and the Florida Class Members.  During these audits, Medco unilaterally and improperly determined that it had overpaid the pharmacy for the claim(s) and issued a DER to Smart and the Florida Class Member along with a letter.

123.     In the letter, Medco states that it will be retracting the alleged overpayments from future reimbursements to the pharmacy.  At some point prior to the expiration of thirty-five days of the pharmacy's receipt of Medco's DER and accompanying letter advising of the alleged overpayment, Medco retracts monies from future amounts due to Smart and the Florida Class members, in violation of Florida Prompt Pay Act.

124.     Florida's Prompt Pay Act (including, but not limited to, F.S.A. § 641.3155, et seq. and F.S.A. §627.6131, et seq.) prohibits Medco from reducing payment to Smart and the Florida Class Members for other/future claims submitted by Smart and the Florida Class Members to Medco unless Smart and the Florida Class Members consent in writing or fail to contest Medco's overpayment claim.  Smart and the Florida Class Members did not consent, in writing or otherwise, to Medco's recovery of monies from other claims that Smart and the Florida Class Members submitted to Medco.  Moreover, Smart and the Florida Class Members contested Medco's alleged notice of overpayment of claims within 35 days of Medco's notice.  Nevertheless, Medco has

retracted from Smart and the Florida Class Members in violation of Florida's Prompt Pay Act.

125.     Medco has deprived Smart and the Florida Class Members of their right and ability to contest Medco's alleged claims for overpayment by improperly retracting monies from Smart and the Florida Class Members despite the fact that Smart and the Florida Class Members did not consent to Medco's reduction of payment to them for other/future claims submitted by them to Medco.

126.     Medco has deprived Smart and the Florida Class Members of their right and ability to contest Medco's alleged claims for overpayment by improperly retracting monies from Smart and the Florida Class Members prior to the expiration of thirty-five (35) days of Smart and the Florida Class Members' receipt of Medco's alleged overpayment of claims, in violation of Florida Prompt Pay laws.

127.     The PSM expressly prohibits a pharmacy, including Smart and the Florida Class members, from contesting several different types of alleged overpayment discrepancies including, but not limited to, overpriced compound discrepancies, in violation of Florida Prompt Pay laws.

128.     Medco never informed Smart and the Florida Class Members of their right to object to Medco's retraction of monies from other/future claims that Smart and the Florida Class Members submitted to Medco, in violation of Florida's Prompt Pay laws.

129.     Upon information and belief, Medco failed to adhere to the requirements of Florida's Prompt Pay Act in order to recover as much money as possible from Smart and the Florida Class Members, with the knowledge and/or intent that Smart and the Florida Class Members would never assert their rights under the Florida statute.

130.     A "Member Group Number" is specified with regard to each claim in a DER.

131.     The pharmacy cannot determine, based on the Member Group Number, whether a given claim is being submitted on behalf of a person who is covered under an Employee Welfare

Benefit Plan.

132.    At no time, either at the point-of-sale or at the time of audit, does Medco reveal to the pharmacy whether the claim is for a covered person under an Employee Welfare Benefit Plan.

133.    At no time, either at the point-of-sale or at the time of audit, does Medco reveal to the pharmacy whether the Member Group Number pertains to an Employee Welfare Benefit Plan. Medco keeps that information secret, to the detriment of the Provider Pharmacy.

134.    Medco has recovered and shall seek to recover substantial sums of money from Smart and the Florida Class Members in violation of the Florida Prompt Pay Act which is incorporated into the Agreement.

**COUNT ONE**
**(Breach of Contract – Vacation Supply Class)**

135.    Plaintiffs and the Vacation Supply Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

136.    The parties had a contract wherein Plaintiffs and the Vacation Supply Class Members agreed to fill prescriptions for Medco cardholders and Medco agreed to pay Plaintiffs and the Vacation Supply Class Members for the prescriptions.

137.    Plaintiffs and the Vacation Supply Class Members were required to utilize Medco's TelePAID© system to submit claims for the prescriptions dispensed to Medco's cardholders.

138.    Plaintiffs and the Vacation Supply Class Members paid Medco a fee to use TelePAID© on a per transaction basis.

139.    Defendant breached its contract with Plaintiffs and the Vacation Supply Class Members by recovering monies from Plaintiffs and the Vacation Supply Class Members for claims that Medco alleges constitute a "Refill Too Soon" discrepancy.  With regard to each such claim, the patient requested the refill early because the patient was not going to be available in the pharmacy's geographic area on the date that the refill became due and would be needed.  Plaintiffs and the

25

Vacation Supply Class Members entered the correct vacation supply override code when performing the override to submit these claims through Medco's TelePAID© system.  Medco accepted these claims after the override code was entered.

140.    In each case, there is no dispute that:

a.  there was a valid prescription, including refills, for the medication,

b.  the patient requested the early refill because he or she would be out of the area at the time the prescription became due,

c.  Plaintiffs and the Vacation Supply Class members refilled and dispensed these prescriptions, and

d.  the patients received the prescriptions.  Nevertheless, Medco has recovered and/or shall seek to recover the monies it previously paid Plaintiffs and the Vacation Supply Class Members for these prescriptions.

141.    Plaintiffs and the Vacation Supply Class Members have substantially performed their obligations under the Agreement, but Medco has nevertheless recovered the monies it initially paid to Plaintiffs and the Vacation Supply Class Members for these claims thereby denying Plaintiffs and the Vacation Supply Class Members the benefit of their bargain and breaching the Agreement.

142.    In addition, Defendant has breached its contract with Plaintiffs and the Vacation Supply Class Members based on the parties course of dealings, usage of trade, and failure to adhere to the "mini contracts" created at the POS.

143.    As a direct and proximate result of Defendant's aforementioned breaches, Plaintiffs and the Vacation Supply Class Members have been caused to sustain substantial damages.

**COUNT TWO**
**(Breach of Contract – Overpriced Compound Class)**

144.     Plaintiffs and the Overpriced Compound Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length

herein.

145.    The parties entered into the Agreement whereby Plaintiffs and the Overpriced Compound Class Members agreed to fill prescriptions for Medco cardholders and Medco agreed to pay Plaintiffs and the Overpriced Compound Class Members for the prescriptions.

146.    Plaintiffs and the Overpriced Compound Class Members were required to utilize Medco's TelePAID© system to submit claims for the compound prescriptions.

147.    Plaintiffs and the Overpriced Compound Class Members paid Medco a fee to use TelePAID© on a per transaction/prescription basis.

148.    Upon electronically submitting the subject compound prescription drug claims to Medco, TelePAID© sent back a message to Plaintiffs and the Overpriced Compound Class Members setting forth the price that Medco would pay Plaintiffs and the Overpriced Compound Class Members to fill the compound prescriptions.  Plaintiffs and the Overpriced Compound Class Members accepted Medco's offer as evidenced by the filling and dispensing of the prescriptions to the patient.  This constituted an agreement to pay Plaintiffs and the Overpriced Compound Class Members for the compound prescriptions.

149.    Medco initially paid Plaintiffs and the Overpriced Compound Class Members in accordance with the price transmitted through the TelePAID© System.

150.    Thereafter, Medco audited Plaintiffs and the Overpriced Compound Class Members and unilaterally and improperly determined that it overpaid Plaintiffs and the Overpriced Compound Class Members for the compound prescriptions.

151.    As a result of its unilateral and improper determinations, Medco has breached the parties' agreement by improperly and unjustifiably recovering sums of money from Plaintiffs and the Overpriced Compound Class Members.  In many cases, Medco is recovering **100% of the amount that it previously paid Plaintiffs and the Overpriced Compound Class Members for the**

**compound prescription.  Thus, if Medco is successful in recovering these monies, Plaintiffs and the Overpriced Compound Class Members will have been paid nothing for the expensive compound prescriptions that they undoubtedly filled and dispensed to Medco cardholders** (with the exception of the nominal co-pay paid to Plaintiffs and the Overpriced Compound Class Members by the patient at the point-of-sale).

152.    Medco breached the Agreement by agreeing to pay Plaintiffs and the Overpriced Compound Class Members a certain price for the various prescriptions at the point-of-sale, paying the price, and thereafter recovering (from future payments Medco owed to Plaintiffs and the Overpriced Compound Class Members) substantial sums of money without any factual and/or legal basis for doing so.

153.    Medco further breached the Agreement by using a different pricing methodology at the point-of-sale as compared to the time of the audits.

154.    Medco further breached the Agreement with Plaintiffs and the Overpriced Compound Class Members by improperly deviating from the parties course of dealings and usage of trade.

155.    As a direct and proximate result of Medco's breach of the Agreement, Plaintiffs and the Overpriced Compound Class Members have been caused to sustain substantial damages.

**COUNT THREE**
**(Breach of Contract – Florida Class)**

156.    Smart and the Florida Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

157.    The parties entered into the Agreement whereby Smart and the Florida Class Members agreed to fill prescriptions for Medco cardholders and Medco agreed to pay Smart and the Florida Class Members for the prescriptions.

158.     Smart and the Florida Class Members were required to utilize Medco's TelePAID©
System to submit claims for the prescriptions dispensed to Eligible Members.

159.     Upon electronically submitting the subject prescription drug claims through the
TelePAID© System, Medco accepted the claim.

160.     Medco paid Smart and the Florida Class Members in accordance with the claims and
prices transmitted through the TelePAID© System.

161.     Thereafter, Medco audited Smart and the Florida Class Members and improperly and
unilaterally determined that it overpaid them for various prescriptions.

162.     As a result of it improper unilateral determinations, Medco retracted substantial
monies from Smart and the Florida Class Members.

163.     Defendant breached its contract with Smart and the Florida Class Members by
Medco reducing/recovering monies from Smart and the Florida Class Members for other/future
claims that Smart and the Florida Class Members submitted to Medco for payment which have
nothing to do with the alleged discrepancies, in violation of Florida's Prompt Pay Act (including,
F.S.A. § 641.3155, et seq.) which is incorporated into the Agreement.

164.     F.S.A. § 641.3155 prohibits Medco from reducing payment to Smart and the Florida
Class Members for other/future claims submitted by Smart and the Florida Class Members to
Medco unless Smart and the Florida Class Members consent in writing or fail to contest Medco's
overpayment claim.   Smart and the Florida Class Members have not consented, in writing or
otherwise, to Medco's recovery of monies from other/future claims that Smart and the Florida Class
Members submitted to Medco.

165.     Medco has also breached its contract with Smart and the Florida Class Members
based on the parties course of dealings, usage of trade, and failure to adhere to the "mini contracts"
created at the POS.

166.     As a direct and proximate result of Medco's breach of the Agreement, Smart and the Florida Class Members have been caused to sustain substantial damages.

### COUNT FOUR
**(Breach of Implied Covenant of Good Faith and Fair Dealing – Vacation Supply Class)**

167.     Plaintiffs and the Vacation Supply Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

168.     In every contract there is an implied covenant of good faith and fair dealing.

169.     Defendant breached this implied covenant of good faith and fair dealing by its actions, including depriving Plaintiffs and the Vacation Supply Class Members the benefit of their bargain by recovering monies that Defendant unequivocally agreed to pay Plaintiffs and the Vacation Supply Class Members.

170.     As a direct and proximate result of the Defendant's improper conduct, Plaintiffs and the Vacation Supply Class Members have been caused to sustain substantial damages.

### COUNT FIVE
**(Breach of Implied Covenant of Good Faith and Fair Dealing –
Overpriced Compound Class)**

171.     Plaintiffs and the Overpriced Compound Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

172.     In every contract there is an implied covenant of good faith and fair dealing.

173.     Defendant breached this implied covenant of good faith and fair dealing by its actions, including depriving Plaintiffs and the Overpriced Compound Class Members the benefit of their bargain by recovering monies that Defendant unequivocally agreed to pay Plaintiffs and the Overpriced Compound Class Members.

174.     As a direct and proximate result of the Defendant's improper conduct, Plaintiffs and the Overpriced Compound Class Members have been caused to sustain substantial damages.

**COUNT SIX**
**(Breach of Implied Covenant of Good Faith and Fair Dealing – Florida Class)**

175.    Smart and the Florida Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

176.    In every contract there is an implied covenant of good faith and fair dealing.

177.    Defendant breached this implied covenant of good faith and fair dealing by its actions, including improperly and prematurely recovering payments previously made to Smart and the Florida Class Members in violation of the Florida Prompt Pay Act (including F.S.A. § 641.3155, et seq.).

178.    As a direct and proximate result of the Defendant's improper conduct, Smart and the Florida Class Members have been caused to sustain substantial damages.

**COUNT SEVEN**
**(Promissory Estoppel – Vacation Supply Class)**

179.    Plaintiffs and the Vacation Supply Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

180.    Defendant made a clear and definite promise, through the acceptance of the claims submitted through the TelePAID© System, that it would pay Plaintiffs and the Vacation Supply Class Members for the prescriptions dispensed to Eligible Persons at the price set forth in the TelePAID© System.

181.    In making these promises, Defendant expected and intended for Plaintiffs and the Vacation Supply Class Members to rely on the information set forth in the TelePAID© System and to dispense the prescriptions to the Eligible Persons at the rates set forth in the TelePAID© System.

182.    Defendant reasonably expected Plaintiffs and the Vacation Supply Class Members to rely on these promises.

183.     Plaintiffs and the Vacation Supply Class Members did in fact reasonably rely on Defendant's promises through the TelePAID© System by dispensing the prescriptions to the Eligible Persons at the rates set forth in the TelePAID© System.

184.     Despite these promises, Medco has since retracted, will continue to retract or has subjected to retraction, monies from Plaintiffs and the Vacation Supply Class Members alleging now that the claims were "Refilled-Too-Soon."

185.     Plaintiffs and the Vacation Supply Class Members relied to their detriment on Defendant's promise to reimburse the claims at the terms set forth in the TelePAID© System.

186.     As a direct and proximate result of the Defendant's improper conduct, Plaintiffs and the Vacation Supply Class Members have been caused to sustain substantial damages.

## COUNT EIGHT
### (Promissory Estoppel – Overpriced Compound Class)

187.     Plaintiffs and the Overpriced Compound Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

188.     Defendant made a clear and definite promise, through the acceptance of the claims submitted through the TelePAID© System, that it would pay Plaintiffs and the Overpriced Compound Class Members for the compound prescriptions dispensed to Eligible Persons at the price set forth in the TelePAID© System.

189.     In making these promises, Defendant expected and intended for Plaintiffs and the Overpriced Compound Class Members to rely on the information set forth in the TelePAID© System and to dispense the compound prescriptions to the Eligible Persons at the rates set forth in the TelePAID© System.

190.     Defendant reasonably expected Plaintiffs and the Overpriced Compound Class Members to rely on these promises.

191.    Plaintiffs and the Overpriced Compound Class Members did in fact reasonably rely on Defendant's promises through the TelePAID© System by dispensing the compound prescriptions to the Eligible Persons at the rates set forth in the TelePAID© System.

192.    Despite these promises, Medco has since retracted, will continue to retract or has subjected to retraction, monies from Plaintiffs and the Overpriced Compound Class Members alleging now that the claims were "Overpriced Compounds."

193.    Plaintiffs and the Overpriced Compound Class Members relied to their detriment on Defendant's promise to reimburse the claims at the terms set forth in the TelePAID© System.

194.    As a direct and proximate result of the Defendant's improper conduct, Plaintiffs and the Overpriced Compound Class Members have been caused to sustain substantial damages.

## COUNT NINE
### (Promissory Estoppel – Florida Class)

195.    Smart and the Florida Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

196.    Defendant made a clear and definite promise, through the acceptance of the claims submitted through the TelePAID© System, that it would pay Smart and the Florida Class Members for the prescriptions dispensed to Eligible Persons at the price set forth in the TelePAID© System.

197.    In making these promises, Defendant expected and intended for Smart and the Florida Class Members to rely on the information set forth in the TelePAID© System and to dispense the prescriptions to the Eligible Persons at the rates set forth in the TelePAID© System.

198.    Defendant reasonably expected Smart and the Florida Class Members to rely on these promises.

199.    Smart and the Florida Class Members did in fact reasonably rely on Defendant's promises through the TelePAID© System by dispensing the prescriptions to the Eligible Persons at the rates set forth in the TelePAID© System.

200.    Despite these promises, Medco has since retracted, will continue to retract or has subjected to retraction, monies from Smart and the Florida Class Members alleging now that the claims were discrepant.

201.    Smart and the Florida Class Members relied to their detriment on Defendant's promise to reimburse the claims at the terms set forth in the TelePAID© System.

202.    As a direct and proximate result of the Defendant's improper conduct, Smart and the Florida Class Members have been caused to sustain substantial damages.

**COUNT TEN**
**(Unjust Enrichment – Vacation Supply Class)**

203.     Plaintiffs and the Vacation Supply Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

204.    During the Relevant Time Period, Plaintiffs and the Vacation Supply Class Members filled and dispensed the subject prescriptions to Medco's cardholders to the benefit of Medco and in accordance with the Agreement.

205.    After Plaintiffs and the Vacation Supply Class Members filled and dispensed the subject prescriptions to Medco's cardholders, Medco improperly and without justification recovered the monies it paid to Plaintiffs and the Vacation Supply Class Members for filling those prescriptions.

206.    After recovering the monies from Plaintiffs and the Vacation Supply Class Members, Medco paid nothing for the prescriptions despite that Medco directly benefitted from Plaintiffs and the Vacation Supply Class Members filling and dispensing of medications to Medco's cardholders.

207.    Defendant has been unjustly enriched as a result of its unjustifiable and improper retraction of monies from Plaintiffs and the Vacations Supply Class Members.

208.    As a direct result of Defendant's unjust enrichment, Plaintiffs and the Vacation Supply Class Members have been proximately caused to sustain substantial damages.

## COUNT ELEVEN
### (Unjust Enrichment – Overpriced Compounds Class)

209.     Plaintiffs and the Overpriced Compound Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

210.     During the Relevant Time Period, Plaintiffs and the Overpriced Compound Class Members filled and dispensed the subject prescriptions to Medco's cardholders to the benefit of Medco and in accordance with the Agreement.

211.     After Plaintiffs and the Overpriced Compound Class Members filled and dispensed the subject prescriptions to Medco's cardholders, Medco improperly and without justification recovered the monies it paid to Plaintiffs and the Overpriced Compound Class Members for filling those prescriptions.

212.     After recovering the monies from Plaintiffs and the Overpriced Compound Class Members, Medco paid nothing for the prescriptions despite that Medco directly benefitted from Plaintiffs and the Overpriced Compound Class Members filling and dispensing of medications to Medco's cardholders.

213.     Defendant has been unjustly enriched as a result of its unjustifiable and improper retraction of monies from Plaintiffs and the Overpriced Compound Class Members.

214.     As a direct result of Defendant's unjust enrichment, Plaintiffs and the Overpriced Compound Class Members have been proximately caused to sustain substantial damages.

## COUNT TWELVE
### (Conversion – Vacation Supply Class)

215.     Plaintiffs and the Vacation Supply Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

216.     Defendant knowingly and willfully deprived Plaintiffs and the Vacation Supply Class

Members of monies due and owing to Plaintiffs and the Vacation Supply Class Members from other/future transactions.

217.    Plaintiffs and the Vacation Supply Class Members have a right to those monies based on the services they provided.

218.    Plaintiffs and the Vacation Supply Class Members did not authorize Defendant to recover those monies.

219.    By improperly and unjustifiably recovering these monies that belong to Plaintiffs and the Vacation Supply Class Members for services rendered, Defendant unlawfully converted the monies.

220.    As a direct and proximate cause of Defendant's unlawful conversion of Plaintiffs and the Vacation Supply Class Members' monies, Plaintiffs and the Vacation Supply Class Members have sustained substantial damages.

## COUNT THIRTEEN
### (Conversion – Overpriced Compound Class)

221.    Plaintiffs and the Overpriced Compound Class Members repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

222.    Defendant knowingly and willfully deprived Plaintiffs and the Overpriced Compound Class Members of monies due and owing to Plaintiffs and the Overpriced Compound Class Members from future transactions.

223.    Plaintiffs and the Overpriced Compound Class Members have a right to those monies based on the services they provided.

224.    Plaintiffs and the Overpriced Compound Class Members did not authorize Defendant to recover those monies.

225.    By improperly and unjustifiably recovering these monies that belong to Plaintiffs and the Overpriced Compound Class Members for services rendered, Defendant unlawfully converted the monies.

226.    As a direct and proximate cause of Defendant's unlawful conversion of Plaintiffs and the Overpriced Compound Class Members' monies, Plaintiffs and the Overpriced Compound Class Members have sustained substantial damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, Smart Pharmacy, Inc. and Highland Pharmacy, L.L.C., on behalf of themselves and the other similarly situated members of the Classes, demand that Judgment be entered by this Court as follows:

A.    Adjudging that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue order certifying the Classes as defined above;

B.    For compensatory, consequential, and punitive damages in excess of $10,000,000;

C.    For pre-judgment and post-judgment interest on such monetary relief;

D.    Granting appropriate permanent injunctive and/or declaratory relief, including, without limitation, an order requiring Defendant to cease the practice of underpaying compound prescriptions alleged to be "overpriced" by Medco, and/or other prescriptions based on a "Refill Too Soon" discrepancy, and from recouping further monies from the Class members for wrongfully alleged discrepancies;

E.    Granting appropriate permanent injunctive and/or declaratory relief, including, without limitation, an order prohibiting Medco from recouping monies from the "open audit" subclasses of the Overpriced Compound Class and Vacation Supply Class;

F.      Granting appropriate permanent injunctive and/or declaratory relief, including, without limitation, an order requiring Defendant to cease engaging in violations of Florida's Prompt Pay laws as set forth herein;

G.      For attorney's fees and costs in an amount to be determined based on the proportion of discrepant claims that are the subject of this class action lawsuit that were submitted to Medco prior to effective date of Defendant's 2009 Pharmacy Services Manual.  (Prior to the 2009 Agreement, there was a fee-shifting provision in the parties' Agreement whereby the prevailing party was entitled to be compensated for its attorney's fees); and

H.      For such other relief as this Court deems just, equitable and appropriate.

## JURY DEMAND

Plaintiffs and the Class members hereby demand a trial by jury on all issues so triable**.**

## DESIGNATION OF TRIAL COUNSEL

Plaintiffs hereby designate Jonathan E. Levitt, Esq. as trial counsel in this matter.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, the undersigned certifies that, to the best of his knowledge, the within matter in controversy is not the subject of any other action pending in any other court or any other pending arbitration and/or administrative proceeding.

**FRIER & LEVITT, LLC**

By:     s/ Todd Mizeski
         Jonathan E. Levitt, Esq. (JL 3881)
         Todd Mizeski, Esq. (TM 3854)
         84 Bloomfield Avenue
         Pine Brook, NJ 07058
         Telephone: (973) 618-1660
         Facsimile:   (973) 618-0650
         jlevitt@frierlevitt.com
         tmizeski@frierlevitt.com

Dated: August 24, 2012         Attorneys for Plaintiffs

38

## CERTIFICATION OF SERVICE

I, Todd Mizeski, Esq., of full age, do hereby certify:

1.      On the date set forth below, the following individuals were automatically served with an Electronic Copy of the attached document via the District of New Jersey's Electronic Case Filing System:

> Peter L. Korn, Esq.
> Jennifer M. Schneider, Esq.
> McElroy, Deutsch, Mulvaney & Carpenter, LLP
> 1300 Mt. Kemble Ave.
> P.O. Box 2075
> Morristown, NJ 07962-2075
> Attorneys for Defendant, Medco Health Solutions, Inc.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

> By:      s/ Todd Mizeski
> Jonathan E. Levitt, Esq. (JL 3881)
> Todd Mizeski, Esq. (TM 3854)
> 84 Bloomfield Avenue
> Pine Brook, NJ 07058
> Telephone: (973) 618-1660
> Facsimile:   (973) 618-0650
> jlevitt@frierlevitt.com
> tmizeski@frierlevitt.com
>
> Attorneys for Plaintiffs, Smart Pharmacy, Inc. and Highland Pharmacy, LLC, individually, and on behalf of others similarly situated

Dated: August 24, 2012